UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

Dellace Holten JR.
Plaintiff

vs.                                    Case No 02C50201

City of Genoa—
—John Klink—
— Robert Smith—
Defendants

**F I L E D**

DEC 07 2009

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

MOTION FOR NEW COUNSEL

NOW COMES: Plaintiff Dellace Holten JR. pro se to request this court an opportunity to explain to the court the reasons behind plaintiffs request for Substitution of Counsel, IN support thereof plaintiff states as follows:

1.) That the plaintiff is represented by the office of Loevy & Loevy 312 N. May Street Suite 100 Chicago, Illinois 60607 for about 7½ years plaintiff has been mislead as to proceeding that the States case in Ogle County must go to trial before the federal case No. 02C50201. Due To Clear Overlaping issues (See) Fuery V. City of Chacago (No. 6-18-2008)

2.) That in addition to Loevys office, attorney Joshua Kutnick working in conjunction with Loevy's office has intentionally delayed the states case for years to prevent additional counts against Ogle County and the state police, the most recent delay is MOTION for lack of jurisdiction with overwhelming PROOF I was NOT shot IN Ogle County.

Pg1. of 4⁴

3) That Attorney Loevy Refuses to call the following witnesses, or Expose for civil trial "Most are key witness" putting plaintiff civil case in Jeopardy and causing high prejudice

1.) Shannon Minner - Who would testify she heard shots being fired as Sgt. Smith and I were leaving the town Genoa, her friends also heard shots no one has ever followed up on this issue. (see ex. 1, 2, 3 Statements) (Issues not Waived)

2.) Lashawn Stifter - Who will testify she was the passenger in the car with the plaintiff heard and saw everything from start to finish, how Sgt. Smith branished his gun threw the window at the start of the incident and threatened the plaintiff over the P.A. system, also how Genoa police officers Klink and Smith after shooting the plaintiff, threw her to the ground putting a gun to the back of her head and cuffed her and other relevant issues. (Issues not Waived)

3.) Jeremy Grubbs - Dekalb officer who has testified in Dekalb court and Ogle county court as to his police car video tape malfunctioning in addition to Klink and Smith tapes malfunctioning the tape would have filmed the crime scene due to his car position facing the crime scene lights flashing meaning his recorder was activated and he admits to this on transcript. (Issues not Waived)

4.) Steve Caan - Forensic Tape Analysis Inc. who has testified in Ogle county court as to the authenticity of the Klink and Smith videotapes and in his expert opinion the tapes are edited and erased and he used his equipment in open court to show how he came to his conclusion in addition he enhanced the sound that was erased on the audio portion of the Smith tape of the -

2 of 44

In addition the state court has barred statements the state police and Genoa police claimed that I made, due to Miranda rights never being read however; only one statement was excluded while leaving open many other alleged statements that should have been barred during this window of time. In addition of recent I have realized "I was shot in DeKalb County (Not Ogle county) once I've raised the issue the county line signs were pulled out of the ground and moved further into DeKalb county leaving holes in the ground and imprints of the jacks in the ground Not only on highway 72. but other roads running east and west on either side of 72. My father has photos to prove these alligations. In addition to that, double jeopardy is a factor, compulsary joinder, one act one crime, res judicata; estoppel doctrines even if I was shot on the line or near the line within 100 rods the law states that I can be charged in one or the other county "not both" and I have already plead guilty to the DeKalb charges. During the Ogle County charges I presently have injuction Motion filed by writ of habeas corpus that DeKalb County has ignored for over 2 months. Now knowing if they address this issue Ogle County prosecution will be no more leaving the door open for two or more additional counts against Ogle County and the state police conspiracy here is obvious.

　　　I undersigned being duly deposed, state that the information as contained herein, and within the annexed exhibites to this objection are true and correct to my knowledge and belief.

Date 11-26-09

/s/ Dellace Holten Jr
Dellace Holten Jr.

16.) That the plaintiff was Never in agreement to exclude VHS tape expert Steve Cain Nor disclose his report violation of rule 26(2)(A) MR. Cain is Key to plaintiffs prevailing in the civil case in addition, the Smith tape will be played at trial, while the Kink tape will be excluded, the tape if played at trial would show on 5-6-02 a drunk driver pull over (tape working fine) on 5-9-02 day of the shooting are missing with date and time code on display and snow and blue screen (erased not working) on 5-8-02 the tape filmed the boat in the impound garage (tape working fine). This is the only available proof on the issue of defense for plaintiff, plaintiff and his family paid thousands of dollars for this expert excluding him would cause irreparable harm.

17.) That the plaintiff was Never prepared for his deposition pursuant to Rule 30(b)(6) nor did he correct or sign

18.) That plaintiff is requesting a stay for two additional reasons 1.) pursuant to the fifth amendment of self-incrimination and 2.) counsel Aurthor Loevy's and office and criminal attorney Joshua Kutnick who was provided by Loevys office are now in receipt of over-whelming proof of county line, plaintiff was not shot in Ogle County yet was prosecuted for 7½ years in the wrong county, counsel is protecting the county, this changes everything in both cases, a stay now is a matter of right due to Jurisdictional dispute. (PROOF WAS FAXED TO Attorney Kutnick)

Wherefore, Plaintiff is requesting new counsel and a stay to prevent further Malpractice, Negligence, Breach of fiduciary duty, and violation of federal rules, every issue in this Motion has never been waived or agreed upon.

Date. 11-26-09

Respectfully Submitted,

/s/ Dellace Holten Jr

DELLACE HOLTEN JR PRO SE
650 West State St.
Rockford, IL 61102

**Expenses** Dépenses Kosten Spese Gastos

815-734-2817

page #11 of 44 EX. 1A



Luz Acevedo was present in the jail lobby waiting to visit A. Roman on 4/8/03. I also participated in the discussion re: car chase & gunfire. Luz also overheard the young lady state that she saw everything — saw the chase & "overheard gunfire" later on as they were leaving town.

Luz Acevedo

I, Renee Jensen, when waiting on 6/3/03 to visit inmate A. Roman overheard the young lady sitting next to me say that she saw the whole thing & then continued the discussion saying that she was there & saw the whole chase scene I heard gun shots as they were leaving town.

Renee Jensen
6/10/03

### FORENSIC FIREARMS CONSULTING
8424 Indian Hills Drive
Nashville, Tennessee 37221

August 10, 2007

Loevy & Loevy
Attorneys at Law
312 N. May Street – Suite 100
Chicago, Illinois 60607

Attention: Mr. Jon Rosenblatt

Re: Dellace Holten v. City of Genoa et al.

Dear Mr. Rosenblatt:

Having reviewed the attached listed documents, plus an in-depth examination of the bullet holes in the 1994 Buick (VIN #1G4HP52J5RH503729) for the case of Holten v. City of Genoa, et al., I offer the following report and conclusions of my findings. These findings are based on my training, skills, and experience in firearms identification, utilizing forensic ballistics and bullet trajectory training as a firearms examiner. My conclusions and opinions are based on this training, experience and a reasonable degree of scientific certainty.

### SUMMARY OF BULLET HOLES IN THE BUICK:
1. One bullet hole in driver's door window (downward angle into left buttock).
2. One bullet hole in driver's door post (downward angle).
3. One bullet hole in left side of engine hood (originates from left front area of vehicle).
4. One bullet hole in right front passenger's window (downward angle into clavicle).
5. One bullet hole in upper right side of rear window (downward angle & into dash vent).
6. One bullet hole in dash vent, left of the radio (see #5).

### SUMMARY OF GUNSHOT WOUNDS TO HOLTEN:
A. One bullet entered left buttock, downward across to right abdomen (Exhibit #27/Lab #14B).
B. One bullet entered left clavicle, downward angle (Exhibit #26/Lab #14A).
C. One bullet injury to lower left knuckle of index finger.

The origin of these injuries are consistent with Holten laying on his right side (facing forward) on the front seat of the Buick, with his head toward the passenger's door and feet toward the driver's door. His knees may have been bent somewhat to fit across the seat.

### 1. DRIVER'S DOOR WINDOW:
The bullet fired through the driver's door window struck Holten in the left buttock (Wound A). The connection of this bullet hole to that particular wound establishes the trajectory angle from which the shot was fired. A Black Talon (Winchester) bullet was recovered from Holten's abdomen and had to be fired from Klink's pistol. This angle is not very steep, approximately thirteen (13) degrees vertically at the point of entrance in the driver's window, and approximately seventy-four (74) degrees horizontally from the front of the Buick. To align Klink's pistol (muzzle) with this trajectory it has to be out away from the driver's window approximately 40" or more, and up from the floor 46" or more, when fired. This puts Klink 20" to 26" further away, depending upon whether his arm was bent or straight out. It also means this shot had to be fired BEFORE any movement of the Buick because after it stopped there was no longer sufficient room for Klink to be between the cars.

Holten v. City of Genoa, et al.
August 10, 2007
Page two

**2. DRIVER'S DOOR POST:**

The bullet hole in the driver's door post entered at a downward angle and made a dent on the inboard side of the post (see Kirby photograph #2-11). The bullet recovered, Exhibit #16, was a Black Talon (Winchester) and had to have been fired by Officer Klink. The trajectory angle of this bullet was not steep, approximately fifteen (15) degrees vertically from the point of entry and approximately sixty-eight (68) degrees horizontally from the left side of the vehicle. This puts Klink's pistol (muzzle) at least 44" from the driver's door and 53" from the ground when it was fired. Klink would have be another 20" to 26" further away, depending upon how he held the pistol. This shot had to be fired BEFORE the Buick moved because after it stopped there was no longer sufficient room between it and Ford.

**3. ENGINE HOOD:**

The bullet hole in the Buick's hood comes from a direction off the left front corner of the Buick, but more to the left side and further away. The hole is consistent with a direct shot and is not from a ricochet. The trajectory is low, approximately thirteen (13) degrees vertically and twenty-two and a half (22.5) degrees horizontally from the left side of the Buick. This indicates the vehicle was stopped, or almost stopped when fired, and the shooter was standing some distance away from vehicle due the very low angle. The bullet recovered from the under side of the hood was a Black Talon (Winchester) and had to be the last shot fired by Klink. He may have been standing in nearly the same place as the first shots into the driver's window and door post.

**4. PASSENGER DOOR WINDOW:**

The bullet hole in the right passenger's window struck Holten in the clavicle (Wound B). The connection of this bullet hole to that particular wound establishes the angle from which the shot was fired. This trajectory angle is very steep, approximately thirty-four (34) degrees vertically at the point of entrance and nearly perpendicular to the side of the Buick. It had to be fired by Smith standing next to, or very close to the right front passenger door, AFTER the vehicle stopped moving. This is supported by a lack of space on that side of the Buick while it was inside the garage, the location of the fired casings (Exhibits #2 or #7) outside the garage, east of the doorway, and having established that Klink was on the other side of the Buick, inside the garage.

**5. REAR WINDOW:**

This bullet entered the upper right side of the glass and traveled across the vehicle from right rear to left front and downward, over the seats, striking the top edge of the dash vent, to the left of the radio. trajectory of these bullet holes are consistent with an angle of approximately nine (9) degrees vertically at the point it entered the rear window and approximately thirty (30) degrees horizontally from the right side of the Buick. Also, no other bullet holes were found inside the vehicle that could have come from the back window. The trajectory of these bullet holes are consistent with a shot fired by Smith standing to the rear of the Buick BEFORE it moved and still inside the garage. It also accounts for one of the two Federal brand casings (Exhibits #2 or #7) that ended up outside of the garage, east of the doorway. The location of Smith's pistol (muzzle) would have to have been at least 45" behind the vehicle's bumper (or 80" from the point of entry in the rear window) and approximately 56" from the ground at the time the shot was fired.

**C. KNUCKLE INJURY:**

The injury to Holten's left index knuckle could be from either of two shots: One, from the shot that came through the right passenger's window--if his hand was up above his shoulder, as if putting his hand up, or trying to cover his head. The latter stands to reason because three gunshots had already been fired (by Klink), one of which had struck him in the buttock, and the Buick's rearward movement was stopped. Depositions state both officers were also yelling at him to give up, put his hands up, get out of the car, etc.

Or two, this injury could have come from the shot that passed through the rear window and hit the dash vent, if Holten's hand was coming upward at the time and got into a line with that bullet's trajectory.

Holten v. City of Genoa, et al.
August 10, 2007
Page three

**CASINGS:**
In general, ejection patterns of casings fired from Glock pistols go upward and to the right of the gun, when held in the normal firing position. Their travel is in a direction nearly perpendicular to the gun, but they may also go slightly forward or rearward of that general direction. Ejected casings can travel as little as one to two feet, or as far as six to eight feet, depending on how tightly the pistol is held. Fired casings are fairly light, but are somewhat "bottom heavy" and easily bounce or careen off a multitude of surfaces. If they land in a soft medium, like loose sand or grass, they often stay in place. They can also be picked up, moved, kicked or intentionally placed in other location(s).

The two silver colored casings recovered outside of the garage, east of the doorway (Exhibits #2 and #7) were Federal brand casings. They are not only consistent with the ammunition carried and used Officer Smith (45 Auto caliber Federal brand Hydra-Shok hollow point), but both were microscopically identified to his pistol. The location of the two Federal casings is consistent with the general position of Smith, out in front of the garage and just east side of the door opening.

The three brass colored casings; two recovered on the driveway behind the Ford (Exhibits # 3 and #4), and one recovered west of the garage door opening (Exhibit #8) were Winchester brand casings. They are not only consistent with the ammunition carried and used by Officer Klink (45 Auto caliber Winchester brand Black Talon hollow point), but were microscopically identified to his pistol.

How these three casings got outside of the garage eighteen feet or more away from where they were fired are of concern. If the two casings in the driveway (Exhibits #3 & #4) were those fired at the driver's side of the Buick they could have careened off the side of either vehicle; the Buick, the Ford, or both. However, the distance where they were recovered is quite far. While it's possible they could have rolled or were kicked from where they actually landed and photographed, they could also have been intentionally picked up from inside the garage and moved.

The third casing, recovered on the ground west of the garage (Exhibit #8), is of greater concern due to its location outside and to the west of the doorway. It is more difficult to explain how it could have come out of the garage, turned the corner, and landed where it was recovered. If the casing traveled out of the garage far enough to land behind either of the vehicles, it would have had to be kicked or carried for it to get in that location.

**CONCLUSION:**
The following opinions are warranted based my analysis of the bullet holes in the '94 Buick and are supported by photographs taken of the Buick with the trajectory of the bullet holes aligned using a mannequin to illustrate Holten's position inside:

1. The five gunshots fired into the '94 Buick by Officers Klink and Smith, and Holten's position inside the vehicle, had to be as describe above due to the physical evidence of bullet holes shown in the scene photographs and the gunshot wounds to Holten.

2. Holten's version of where he was, his position, and what he did while inside the '94 Buick are consistent with the evidence of the bullet holes in the Buick and his gunshot wounds.

3. Klink and Smith's version of how the shooting occurred is inconsistent with the evidence from the bullet holes and the wounds in Holten.

4. The position of the two vehicles just prior to, during, and at the end of the shooting supports the angles and trajectory of the shots fired by the officers as detailed above.



Sep-05-07   07:47pm   From-                                    T-480  P 020/020  F-067

Holten v. City of Genoa, et al.
August 10, 2007
Page four

5.  The bullet strike in the Buick's engine hood is consistent with a direct hit by a bullet fired toward
    the windshield and is not from a ricochet. This is based on several things:

    a.  The angle of incident at the initial point of contact in the engine's hood is consistent with
        the nose of a bullet traveling in a straight line and was not a deflection. (A ricocheted
        bullet tends to yawl, due to the change of direction, and strikes secondary objects at an
        oblique angle.)

    b.  The shape, width and length of the hole in the hood is consistent with a direct hit and not
        with a ricochet.

    c.  The recovery of a Black Talon (Winchester) bullet from the underside of the hood within
        a supporting structure just rearward of the hole  (A bullet deflected in ricochet has a
        substantially reduced velocity, approximately 50% for each ricochet, and does not
        penetrate at such a low angles.) The fact that the bullet had sufficient velocity to pass
        through the steel hood, enter the structural support member and still bury itself there is
        evidence of it maintaining most of its velocity.

    d.  Research has shown that the angle of departure for bullets that ricochet are at very low
        angles to the striking surface, no matter what the angle of incident may have been.
        Bullets never ricochet at angles of ninety degrees or less to the angle of incidence.

These opinions are supported by my training, over 35 years of experience investigating and conducting
shooting reconstructions of gunshots to a number of objects including homes, businesses and automobiles
with the Illinois State Police, Indiana State Police, and the Indianapolis-Marion County Crime Lab.

Attached are copies of a list of articles I have written and cases in which I have consulted over the last four
years. Also, as a matter of my routine duties when I was employed with the ISP and IMCFSA, I testified
approximately 500 times in criminal cases, both in state and federal courts. While most of these cases were
for the prosecution, a few cases were for the defense. I no longer have access to any of those case files or
court records. During the 24 years I was with the ISP my testimony averaged 8 to 12 times per year; in the
ten years I was in Indianapolis, it averaged once a week.

If you have any questions regarding any of this material or the opinions given please contact me.

Respectfully submitted,

*David J. Brundage*

David J. Brundage,
Forensic Firearms Consultant

Attachments:

Pg. 26 of 44

B



# Forensic Tape Analysis, Inc.

Scott Cain MFS        638 W. Main St. Lake Geneva, WI 53147        Michael R Chial, PhD
President/C.E.O.                                                   University of Wisconsin
Forensic Scientist                                                Board of Directors



---

**Date:**       1/21/04

**To:**       Office of the Ogle County Public Defender
              Dennis Riley
              **Phone:  815-732-7444**
              **Fax:      815-732-9934**

**From:**     Jody Brock
              Forensic Tape Analysis, Inc.
              **Phone:  262-348-1313**
              **Fax:      262-348-0037**
              **Email:**  *info@tapeexpert.com*

**\*\*\*Evidence Mailing:     638 W. Main Street
                        Lake Geneva, WI 53147**

---

**To:**

the tapes' authenticity.

Pg. 27 0f 44

To assist in the examination process, a variety of instrumental tools were utilized in this examination. These included a cross-pulse monitor, video signal generators, oscilloscopes, waveform monitors, and spectral analysis devices.

On 12/30/03 I telephonically provided Attorney Riley with the preliminary results of my forensic tape examination concerning both the Kling and Smith videotape copies regarding there authenticity. I was advised that the Klink tape could be considered the primary tape for initial inspection and that I might be able to utilize the Smith tape as a type of exemplar or control videotape which contained the normal recording procedures utilized by Officer Smith in the recording of various traffic stops. Attorney Riley indicated that he would attempt to have the Smith tape accepted as a known sample of Genoa Police video recording operations.

Regarding the questioned Klink recording, there are a number of suspicious loss of video record events together with other problems with the audio and control track data which casts suspicion concerning the integrity and reliability of this particular videotape. For example throughout the entire Klink tape there is a high noise level signal in the audio portion of the videotape copy which does not coincide with normal police operation nor does it appear on the Sergeant Smith videotape which contains normal audio transmissions between the police dispatcher and individuals that the officer is talking to. Following the 5/6/02 late evening stop of a female driver occurring at around 23:11, there appear two separate dated entries with blue screen background dated 5/7/02 specifically at 17:40 and 17:44 which contains no additional video signal and involves a stopping and re-starting of the recorder. The final scene on the Klink tape appears at 5/8/02 at 14:53 where a boat trailer apparently parked in the garage appears and lasts for several minutes. Again high level noise is apparent and no audible conversation is heard. The last scene on 5/8/02 possibly could be an over-record or an erasing of original tape content but this cannot be determined without an inspection of the original recorder and videotape from which it was manufactured.

It was also apparent during the review of the police inventory sheet that a Viper Recording System was contained within the Klink squad car. Review of Internet information contained on the Viper System provided substantial detail concerning both the recording camera, the audio system, and other VCR tracking parameters which should assist in the ultimate forensic conclusions associated in this case.

On or about 12/30/03 I attempted to verbally assist Attorney Riley in the development of a draft affidavit for the release of the original tapes and recording equipment. Unfortunately due to the Holiday season, Attorney Riley was unable to obtain a copy of our sample affidavit which is attached. My findings thus far indicate that there is considerable doubt concerning the authenticity and reliability of the Klink tape and that through testing of the appropriate recording equipment and the original videotape a final determination should be able to be rendered concerning any possible editing on this questioned recording. Also attached is a copy of my 1999 article "The Forensic Examination of Video Recordings" which describes the basic protocols that forensic tape experts utilize in examining questioned tape recordings.

pg. 28 of 44

15 oF 29

As the ability to manipulate video/audio evidence becomes more widespread and effective the historical admissibility standards will be rendered inadequate. Likewise as "undetectable" video editing becomes more prevalent, it is likely that future video evidence may be excluded if the slightest hint of falsifications exists. (IBID #6).

## References

1. Gruber, G. Electronic Evidence. Lawyers Cooperative Publishing, 1995, pages 551-552.
2. IBID, No. 6, page 506.
3. IBID, No. 6, page 561.
4. IBID, No. 6, page 924-925.
5. Levine, B. *VideoMaker Magazine*, "Bits and Bytes," June 1996, pages 90-91.
6. MacCauly, D. The Way Things Work, Houghton-Mifflin, 1988, pages 260-261.
7. Miles, DH. Audio Production Techniques for Video, Focal Press, 1987, pages 12-13.
8. Nedph, R. *VideoMaker Magazine*, "Linear vs. Non-Linear Editing Systems," June 1996, page 62.
9. Stinson, J. *VideoMaker Magazine*, "Simple Camcorder Editing," June 1995, pages 16-18.
10. Suretow, S. *VideoMaker Magazine*, "A TBC Tale," June 1996, pages 63-66.
11. York, M. *VideoMaker Magazine*, (#3), published by Patricia York, New York, June 1996. page 5.

## About the author

Mr. Steve Cain served 22 years as both a Special Agent and a forensic specialist with the U.S. Secret Service and IRS National Crime Laboratories before founding Applied Forensic Technologies, Intl., Inc. (AFTI) in Lake Geneva, Wisconsin. A majority of his business concerns the identification of questioned voice recordings or issues relating to audio or video tape recording authenticity or Questioned Documents Examinations.

Mr. Cain received his bachelor's degree at the USAF Academy in 1967 and later completed two Masters of Forensic Science degrees at George Washington University and Antioch School of Law. He has completed two years of a Ph.D. in Criminology at the University of Maryland. He has attended numerous specialized courses of instruction in forensics throughout the U.S. and is both board certified and court qualified (federal and state) in a variety of disciplines. Mr. Cain has published more than twenty articles in forensic, investigative, and legal journals and has been a guest speaker at numerous national/international conferences regarding forensic examination techniques.

He has testified in over 40 states, Hong Kong, Puerto Rico, and Canada in both criminal and civil cases. He is presently on the Advisory Board for the American Board of Recorded Evidence.

# American Board of Recorded Evidence



## ABRE Course Work and Prerequisites for Diplomate Certification

### Requirements for Voice Identification

The applicant must join ABRE/ACFE and present his/her credentials. Upon acceptance as a member, the student will pay a fee for preliminary written materials, which the student will complete and return to the ABRE for scoring. This will determine whether or not the applicant shows an aptitude for the pattern matching and aural analysis techniques presented in the preliminary written materials. Provided the student passes the preliminary tests, and an audiologist hearing and word discrimination test, he/she may move to the next step. The next step consists of a two week (9 to 5) training course in the fundamentals of aural/spectrographic voice identification analysis. Once the student completes this course, and works under a mentor (a certified examiner), and completes a total of 100 cases, he/she may be eligible to take the Certification Examination. This exam consists of a written and a practical exam. If the student passes the examination, he/she may apply to the ABRE for Diplomate/Certified/Voice Identification Examiner.

### Requirements for Audio and Video Authenticity

The applicant must join ABRE/ACFE and present his/her credentials. Upon acceptance as a member, applicant must attend a total of two (one-week) sessions at The New York Institute for Forensic Audio in order to be eligible to take the certification tests in these two specialties. The NYIFA specializes in audio and video authenticity, enhancement, and advanced digital voice identification analysis.

After attending the second session, the student applies to take the certification test by submitting a hearing test, a 25 case roster of cases completed in each area (Audio/Video), and two complete reports of two current cases in each area. If the student passes the certification test, has no ethics violations, and displays good oral and writing skills, the student is then eligible for certification.

**For further information on Voice Identification, Contact:**

Ernst "Rik" Alexanderson or Voice Identification, Inc.
P.O. Box 714
Somerville, NJ 08876
(908) 526-3408

Lonnie Smrkovski
Smrkovski & Associates
4829 Tartan Lane
Holt, MI 48842
(517) 694-1433

**For further information on Audio/Video Authenticity, Contact:**

Tom Owen
NYIFA c/o Owl Investigations
500 Fifth Ave., Suite 2300
New York, NY 10110
(212) 730-6886

After January 1, 2000 in addition to meeting the all of the above requirements the following will be required:
- Successful completion of Ethics and Recorded Evidence I courses.
- Successful completion of comprehensive three-part examination.

After January 1, 2001 in addition to meeting the all of the above requirements the following will be required:
- Successful completion of Law and Recorded Evidence II courses.

After January 1, 2002 in addition to meeting the all of the above requirements the following will be required:
- Successful completion of Evidence and Recorded Evidence III courses.

Sincerely,

Forensic Tape Analysis, Inc.

Steve Cain
President
Board Certified Forensic Video Examiner

Attachments; "The Forensic Examination of Video Recordings", Sample Affidavit

# INVESTIGATIVE REPORT

| File #: | Reporting/Incident Date(s): | Reporting Agent(s): | ID#: | Dictated/LEAD #: |
|---|---|---|---|---|
| 02-13723-ST | 05/07/02 | Sgt. Jerome Costliow #3795 | | |

| Title: | Case Agent: ID#: | Office: | Typed by: | Date: |
|---|---|---|---|---|
| JOHN D.P. KLINK et al | Sgt. J. Costliow #3795 | Zone 2/ST | slh | 05/09/02 |

**Purpose:**

Transcript of Video Recording From Sgt. Robert Smith's Squad

On 05/07/02, at approximately 7:30 PM, Sgt. Jamie Messer (Ogle County Sheriff's Department) contacted the Illinois State Police (ISP) District 01 headquarters (Sterling, Illinois), and spoke with Sgt. John L. Clark. Sgt. Messer related that Chief Donald Smith of the Genoa (Illinois) Police Department was requesting that the Illinois State Police investigate an officer involved shooting that had occurred at 6498 North East Line Road, Monroe Center, Ogle County, Illinois. The subject who was shot was DELLACE C. HOLTEN JR. (m/w, dob: 03/16/65, LKA: 1526 Edveta Drive, Rockford, Illinois, Tx 815/229/2689), who had been involved in a police pursuit on 05/07/02 initiated by the Genoa Police Department. The police officers involved in the shooting were identified as Officer JOHN D.P. KLINK (m/w, dob: 05/08/62) and Sgt. ROBERT W. SMITH (m/w, dob: 01/28/68), both from the Genoa Police Department.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The following is a transcript of the video recording from Sgt. Robert Smith's squad car. The transcript reflects comments made by Sgt. Smith to DELLACE HOLTEN over the public address system of his squad car while in pursuit of HOLTEN on East County Line Road, just off Illinois Route 72.

Sgt. SMITH:       Stop the car! Stop the car! Hey! Stop the car! Stop the car! Stop the car, or I'll shoot at you! Now! Stop! Stop the car! Hey! Stop the car! I will shoot at you! Stop the car, or I'm gonna shoot! Now! I'm gonna shoot at you! Right now! Stop the car! Stop the car!

(END)

**Dissemination:**

This document contains neither recommendations nor conclusions of the Illinois State Police. It and its contents are not to be disseminated outside your agency.

ENTERED

23-0117                                                                                    ISP 44 (01/00)



REAR WINDOW DEPICTS A CLEAR IMPRESSION IN THE GLASS OF TWO STRIKES FROM A STATE-POLICE NIGHT-STICK, IN AN ATTEMPT TO CUER-UP THE BULLET HOLE TRAJECTORY OF THE SHOT FIRED BY OFFICER SMITH.
(HAND-SHOT)

THE DRIVER'S DOOR DEPICTS A CLEAR IMPRESSION IN THE GLASS OF 3 STRIKES FROM A STATE POLICE NIGHT-STICK IN AN ATTEMPT TO COVER-UP THE BULLET HOLE TRAJECTORY OF THE SHOT FIRED BY OFFICER KLINK. (SHOT IN BUTTOCKS.)

PG.# 33 OF 44
a1



3 - CLEAR
"CUTTING" STRIKES

WITH A CLUB ONLY
STATE POLICE CARRY
ITS THEIR CRIME
SCENE AT THIS
POINT.

**DEFENSE EXHIBIT D-4**
PHOTOGRAPH OF BLUE BUICK SHOWING FRONT DRIVER'S
SIDE WINDOW WITH A SINGLE BULLET HOLE



GARAGE FLOOR
IS NOT MOVED
YET

**DEFENSE EXHIBIT D-5**
PHOTOGRAPH OF BLUE BUICK SHOWING
FRONT DRIVER'S SIDE WINDOW BROKEN

18 OF 29     PG. 32 OF 44



704

**DEFENSE EXHIBIT D-6**
**PHOTOGRAPH OF BLUE BUICK SHOWING FRONT PASSENGER**
**SIDE WINDOW WITH A SINGLE BULLET HOLE**



**DEFENSE EXHIBIT D-7**
**PHOTOGRAPH OF BLUE BUICK SHOWING**
**FRONT PASSENGER SIDE WINDOW BROKEN**

Pg. 34 of 44



DEFENSE EXHIBIT D1-D2
PHOTOGRAPHS OF BLUE BUICK SHOWING REAR
WINDOW WITH A SINGLE BULLET HOLE



DEFENDANT'S
EXHIBIT



pg. 37 of 44

24.^B OF 29



DEFENSE EXHIBIT D-3
PHOTOGRAPH OF BLUE BUICK SHOWING REAR
WINDOW BROKEN



State Police
Admit to Missing or
Destroyed

**DEFENSE EXHIBIT B1-B2**
**PHOTOGRAPHS SHOWING DEFENDANT'S**
**BLACK BASEBALL CAP INSIDE BLUE BUICK**



Pg. 38 OF 44

DEF EX. 25 OF 29



DEFENDANT'S
EXHIBIT



Group Ex. 2
Photo 2- OF Group 2







Lynch photos

Pg. 46 of 44

27³ of 29

STATE OF ILLINOIS        )
                              )    SS
COUNTY OF OGLE       )

## IN THE CIRCUIT COURT OF THE 15TH JUDICIAL DISTRICT
## COUNTY OF OGLE

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS,     ) | |
|                                           ) | |
|        Plaintiff,                 ) | |
|                                           ) | |
|        v.                             ) |    Case No. 02 CF 135 |
|                                           ) | |
| DELLACE C. HOLTEN, JR.,            ) | |
|                                           ) | |
|        Defendant.             ) | |

## <u>MOTION TO DISMISS INFORMATION FOR LACK OF JURISDICTION</u>

**NOW COMES**, the defendant, **DELLACE C. HOLTEN, JR.**, by and through his attorney, Joshua B. Kutnick, and moves this Honorable Court for an Order to be entered dismissing the instant case pursuant to 725 ILCS 5/114-1 (6) and (7). In support thereof, Movant states as follows:

1)    Defendant is charged in this matter with burglary, reckless conduct, and criminal damage to property.

2)    These allegations, whether founded or not, did not occur within the County of Ogle. This incident occurred within the County of DeKalb. The Wittwer farm actually lies in the County of Dekalb.

3)    Defendant has previously pled guilty to offenses that are part of a continuous course of conduct that began with the charges in the DeKalb County prosecution and ended at the Wittwer farm when Holten was shot by Genoa Police officers.

4)    720 ILCS 5/1-6 states, "Criminal actions shall be tried in the county where the



43 OF 44

offense was committed except as otherwise provided by law...."

5) 720 ILCS 5/3-3(b) states, "If the several offenses are known to the proper prosecuting officer at the time of commencing the prosecution and are within the jurisdiction of a single court, they must be prosecuted in a single prosecution....".

6) On information and belief, and pursuant to his own investigation, Defendant avers that the Wittwer farm does not lie within the boundaries of Ogle County.

7) Because the State has the burden of proof as to each and every element of the crime, including jurisdiction, the State must prove beyond a reasonable doubt that the location of this alleged incident occurred within Ogle County. Without such proof, this cause must be dismissed.

WHEREFORE, Defendant prays this Honorable Court enter an order dismissing the instant case for lack of jurisdiction and for any such other relief as this Court deems just.

Respectfully Submitted,

_____

Attorney for Dellace Holten, Jr.

**JOSHUA B. KUTNICK**
**820 WEST JACKSON BLVD., SUITE 300**
**CHICAGO, IL 60607**
**312-441-0211**
**ARDC#6270122**

430F44          EX. C-2

STATE OF ILLINOIS )
)  SS
COUNTY OF OGLE )

## IN THE CIRCUIT COURT OF THE 15TH JUDICIAL DISTRICT
## COUNTY OF OGLE

PEOPLE OF THE STATE OF ILLINOIS, )
)
    Plaintiff, )
)
    v. )     Case No. 02 CF 135
)
DELLACE C. HOLTEN, JR., )
)
    Defendant. )

## MOTION TO DISMISS INFORMATION FOR LACK OF JURISDICTION

NOW COMES, the defendant, **DELLACE C. HOLTEN, JR.**, by and through

his attorney, Joshua B. Kutnick, and moves this Honorable Court for an Order to be

entered dismissing the instant case pursuant to 725 ILCS 5/114-1 (6) and (7). In support

thereof, Movant states as follows:

1)     Defendant is charged in this matter with burglary, reckless conduct, and

       criminal damage to property.

2)     These allegations, whether founded or not, did not occur within the County of

       Ogle. This incident occurred within the County of DeKalb. The Wittwer

       farm actually lies in the County of Dekalb.

3)     Defendant has previously pled guilty to offenses that are part of a continuous

       course of conduct that began with the charges in the DeKalb County

       prosecution and ended at the Wittwer farm when Holten was shot by Genoa

       Police officers.

4)     720 ILCS 5/1-6 states, "Criminal actions shall be tried in the county where the

43-OF-44    EX. C-1

offense was committed except as otherwise provided by law...."

5)     720 ILCS 5/3-3(b) states, "If the several offenses are known to the proper prosecuting officer at the time of commencing the prosecution and are within the jurisdiction of a single court, they must be prosecuted in a single prosecution....".

6)     On information and belief, and pursuant to his own investigation, Defendant avers that the Wittwer farm does not lie within the boundaries of Ogle County.

7)     Because the State has the burden of proof as to each and every element of the crime, including jurisdiction, the State must prove beyond a reasonable doubt that the location of this alleged incident occurred within Ogle County. Without such proof, this cause must be dismissed.

WHEREFORE, Defendant prays this Honorable Court enter an order dismissing the instant case for lack of jurisdiction and for any such other relief as this Court deems just.

Respectfully Submitted,

_____

Attorney for Dellace Holten, Jr.

**JOSHUA B. KUTNICK**
**820 WEST JACKSON BLVD., SUITE 300**
**CHICAGO, IL 60607**
**312-441-0211**
**ARDC#6270122**

44-OF-44    EX. C27